ORIGINAL
FILED

AUG 1 3 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  MARIO N. ALIOTO, ESQ. (56433)
   LAUREN C. RUSSELL, ESQ. (241151)
2  **TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP**
   2280 Union Street
3  San Francisco, CA 94123
   Telephone: (415) 563-7200
4  Facsimile: (415) 346-0679
5  malioto@tatp.com
   laurenrussell@tatp.com
6
   JOSEPH M. PATANE, ESQ. (72202)
7  **LAW OFFICE OF JOSEPH M. PATANE**
8  2280 Union Street
   San Francisco, CA 94123
9  Telephone: (415) 563-7200
   Facsimile: (415) 346-0679
10 jpatane@tatp.com

E-filing

11 Attorneys for Plaintiff

12                                                          *JCS*

**UNITED STATES DISTRICT COURT**

13
**NORTHERN DISTRICT OF CALIFORNIA**
14

15 BRIAN FOSTER, on behalf of himself and all       Case No.
   others similarly situated,              CV  08    3877
16                                              )
17              Plaintiff,                      )   **CLASS ACTION COMPLAINT**
   vs.                                          )
18                                              )
   HORIZON LINES, INC.; HORIZON LINES,          )
19 LLC; MATSON NAVIGATION                       )   **JURY TRIAL DEMANDED**
   COMPANY, INC.; and ALEXANDER &               )
20 BALDWIN, INC.                                )
                                                )
21              Defendants.                     )
22                                              )

23

24

25

26

27

28

1

## CLASS ACTION COMPLAINT

2       Plaintiff Brian Foster ("Foster") on behalf of himself and all others similarly situated in

3    the United States brings this action for treble damages and injunctive relief under the federal

4    antitrust laws of the United States against Defendants Horizon Lines, Inc., Horizon Lines, LLC,

5    Matson Navigation Company, Inc., and Alexander & Baldwin, Inc. ("Defendants"), demanding

6    trial by jury, and complaining and alleging as follows:

7

## NATURE OF THE CASE

8       1.      This lawsuit is brought as a class action on behalf of individuals and entities that

9    purchased domestic ocean shipping services for shipment of goods between the continental

10   United States and Hawaii ("Hawaii Ocean Shipping") directly from Defendants, their

11   predecessors, or their controlled subsidiaries and affiliates during the period beginning no later

12   than October 1, 1999 and continuing through the present (the "Class Period").

13      2.      Defendants are domestic ocean shipping liners who collectively transport

14   millions of tons of cargo each year between ports in the contiguous United States and in the

15   United States' territories and possessions. One of the routes serviced by all Defendants is the

16   route between the contiguous United States and Hawaii.

17      3.      Plaintiff alleges that during the Class Period, Defendants conspired to fix, raise,

18   maintain or stabilize prices charged for Hawaii Ocean Shipping services. As a result of

19   Defendants' unlawful conduct as alleged herein, Plaintiff and the other members of the proposed

20   Class paid artificially inflated prices that exceeded the amount they would have paid if a

21   competitive market had determined prices for Hawaii Ocean Shipping.

22      4.      Plaintiff alleges that Defendants' cartel and conspiracy is in violation of Section

23   1 of the Sherman Act, 15 U.S.C. § 1, which prohibits restraints of trade. Plaintiff seeks treble

24   damages and injunctive relief on behalf of himself and all other similarly situated direct

25   purchasers of Hawaii Ocean Shipping during the Class Period.

26

## JURISDICTION AND VENUE

27      5.      This Court has subject matter jurisdiction over this action based on Sections 4

28   and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) which confer to the United States district

**2**
**CLASS ACTION COMPLAINT**

1   courts jurisdiction over actions seeking damages and costs, including reasonable attorneys' fees,
2   for violations of the Sherman Act. Section 16 of the Clayton Act, 15 U.S.C. § 26, is the basis
3   for this Court's jurisdiction over Plaintiff's claim for injunctive relief. This Court also has
4   jurisdiction under 28 U.S.C. §§ 1331 and 1337.

5      6.      This Court has personal jurisdiction over Defendants because they systematically
6   and continually conduct business in the United States, including marketing, advertising, and
7   sales directed to residents here.

8      7.      Venue is laid in this District pursuant to 15 U.S.C. §§15 and 22, and 28 U.S.C. §
9   1391(b) and (c). Venue is proper in this judicial district because during the Class Period one or
10  more of the Defendants resided, transacted business, was found, or had agents in this district,
11  and because a substantial part of the events giving rise to Plaintiff's claims occurred in this
12  district, and a substantial portion of the affected interstate trade and commerce described below
13  has been carried out in this district.

## DEFINITIONS

14

15     8.      As used herein, the term "Hawaii Ocean Shipping" means and includes domestic
16  ocean shipping services for shipment of goods between the continental United States and
17  Hawaii.

18     9.      The "Class Period" or "relevant period" means the period from at least October
19  1, 1999 and continuing through the present.

20     10.     "Person" means any individual, partnership, corporation, association, or other
21  business or legal entity.

## PLAINTIFF

22

23     11.     Plaintiff Brian Foster ("Foster") is a resident of Hawaii. During the relevant
24  period, Foster purchased Hawaii Ocean Shipping services directly from defendant Matson
25  Navigation Company, Inc. and has been injured by reason of the antitrust violations alleged in
26  this Complaint.

27  //

28  //

**3**
**CLASS ACTION COMPLAINT**

1

**DEFENDANTS**

2

12. Defendant Horizon Lines, Inc. is a Delaware corporation with its principal place

3 of business located at 4064 Colony Road, Suite 200 Charlotte, NC 28211. Horizon Lines, Inc.

4 operates as a holding company for three wholly-owned subsidiaries, including defendant

5 Horizon Lines, LLC. Horizon Lines Inc. is the nation's leading domestic ocean shipping and

6 integrated logistics company, accounting for approximately 38 percent of the total U.S. marine

7 container shipments from the continental United States to Hawaii, Alaska, Puerto Rico, Guam

8 and Micronesia. During the Class Period, Horizon Lines, Inc., directly and through its

9 subsidiaries and affiliates, sold Hawaii Ocean Shipping services to customers throughout the

10 United States and its territories and possessions.

11

13. Defendant Horizon Lines, LLC is a wholly-owned operating subsidiary of

12 defendant Horizon Lines, Inc. Horizon Lines, LLC is a Delaware limited liability company with

13 its principal place of business located at 4064 Colony Road, Suite 200 Charlotte, NC 28211.

14 Horizon Lines, LLC operates a fleet of 21 U.S.-flag containerships and 5 port terminals linking

15 the continental United States with Alaska, Hawaii, Guam, Micronesia and Puerto Rico. During

16 the Class Period, Horizon Lines, LLC sold Hawaii Ocean Shipping services to customers

17 throughout the United States and its territories and possessions.

18

14. Defendants Horizon Lines, Inc. and Horizon Lines, LLC are collectively referred

19 to herein as "Horizon." Horizon accounts for approximately 33 percent of the market for the

20 noncontiguous domestic ocean shipping to Hawaii.

21

15. Defendant Matson Navigation Company, Inc. is a Hawaii corporation with its

22 principal place of business located at 555 12th St., 7th Fl., Oakland, CA 94607. It is a wholly-

23 owned subsidiary of defendant Alexander & Baldwin, Inc. According to their website, Matson

24 Navigation Company, Inc. is the principal carrier of containerized freight and automobiles

25 between the U.S. Pacific Coast and Hawaii, Guam, and the mid-Pacific. It is also the largest

26 provider of noncontiguous domestic ocean shipping to Hawaii, accounting for approximately 67

27 percent of the market. During the Class Period, Matson Navigation Company, Inc. sold Hawaii

28

**4**
**CLASS ACTION COMPLAINT**

1   Ocean Shipping services to customers throughout the United States and its territories and
2   possessions.

3   16.    Defendant Alexander & Baldwin, Inc. is a Hawaii corporation with its principal
4   place of business located at 822 Bishop Street, Honolulu, Hawaii 96813-3924. As part of its
5   diversified portfolio, Alexander & Baldwin, Inc. provides Hawaii Ocean Shipping services
6   through its largest subsidiary—Matson Navigation Company, Inc. During the Class Period,
7   Alexander & Baldwin, Inc. sold Hawaii Ocean Shipping services, directly and through its
8   subsidiaries and affiliates, to customers throughout the United States and its territories and
9   possessions.

10   17.    Defendants Matson Navigation Company, Inc. and Alexander & Baldwin, Inc.
11   are collectively referred to herein as "Matson."

12   **UNNAMED CO-CONSPIRATORS**

13   18.    On information and belief, various other shipping companies, trade associations,
14   persons and/or entities, not named as Defendants herein, have participated as co-conspirators
15   with Defendants and have performed acts and made statements in furtherance of the conspiracy
16   and/or in furtherance of the anticompetitive, unfair or deceptive conduct alleged herein. The
17   allegations in this Complaint apply equally to these unnamed co-conspirators.

18   19.    Whenever in this Complaint reference is made to any act, deed or transaction of
19   any corporation, the allegation means that the corporation engaged in the act, deed or transaction
20   by or through its officers, directors, agents, employees or representatives while they were
21   actively engaged in the management, direction, control or transaction of the corporation's
22   business or affairs.

23   20.    Each of the Defendants named herein acted as the agent or joint venturer of or for
24   the other Defendants with respect to the acts, violations and common course of conduct alleged
25   herein. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.
26   Defendants, and each of them, are individually sued as participants and as aiders and abettors in
27   the improper acts and transactions that are the subject of this action.

28

**5**
**CLASS ACTION COMPLAINT**

1

## INTERSTATE TRADE AND COMMERCE

2       21.     During the Class Period, Defendants were major companies in the Hawaii Ocean

3    Shipping industry.

4       22.     Throughout the Class Period, the Hawaii Ocean Shipping services purchased

5    from Defendants by Plaintiff and the other Class members created a continuous and

6    uninterrupted flow of transactions within the United States, including this District. Defendants'

7    unlawful conduct took place within the flow of interstate commerce and affected customers

8    located throughout the United States, including this District, as well as throughout the world.

9    Defendants' unlawful conduct had a direct, substantial, and reasonably foreseeable effect in

10   restraint of trade on both interstate and international commerce.

11

## CLASS ACTION ALLEGATIONS

12      23.     Plaintiff brings this action on behalf of himself and as a class action under the

13   provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all

14   members of the following class:

15          All persons and/or entities that purchased Hawaii Ocean Shipping services from
            Defendants, their co-conspirators, or any present or former parent, subsidiary or
16          affiliate of Defendants, at any time during the period from at least October 1,
            1999 through the present, the exact dates being unknown to Plaintiff. Excluded
17          from the Class are Defendants, their co-conspirators, all present or former
            parents, predecessors, subsidiaries or affiliates of Defendants, and all
18          governmental entities.

19

20      24.     This action has been brought and may properly be maintained as a class action

21   pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

22              a.      The Class is ascertainable and there is a well-defined community of

23   interest among members of the Class;

24              b.      Based upon the nature of trade and commerce involved and the number of

25   direct purchasers of Hawaii Ocean Shipping services from Defendants, Plaintiff believes that the

26   members of the Class number in the thousands, and therefore are sufficiently numerous that

27   joinder of all Class members is not practicable;

28

**6**
**CLASS ACTION COMPLAINT**

1        c.      Plaintiff's claims are typical of the claims of the members of the Class

2  because Plaintiff directly purchased Hawaii Ocean Shipping services from Defendants, and

3  therefore Plaintiff's claims arise from the same common course of conduct giving rise to the

4  claims of the members of the Class and the relief sought is common to the Class;

5        d.      The following common questions of law or fact, among others, exist as to

6  the members of the Class:

7              i.      Whether Defendants and their co-conspirators formed and

8  operated a combination or conspiracy to fix, raise, maintain, and/or stabilize the price of Hawaii

9  Ocean Shipping services and/or engaged in market allocation for those services sold in the

10  United States and its territories and possessions;

11             ii.      Whether the combination or conspiracy caused the prices for

12  Hawaii Ocean Shipping services to be higher than they would have been in the absence of

13  Defendants' conduct;

14             iii.     The identity of the participants in the conspiracy;

15             iv.     The operative time period of Defendants' combination or

16  conspiracy;

17             v.      Whether Defendants' conduct caused injury to the business or

18  property of Plaintiff and the members of the Class;

19             vi.     The appropriate measure of the amount of damages suffered by

20  the Class;

21             vii.    Whether Defendants' conduct violates Section 1 of the Sherman

22  Act;

23             viii.   Whether Defendants took steps to actively conceal the conspiracy;

24  and

25             ix.     The appropriate nature of class-wide equitable relief.

26        e.      These and other questions of law and fact common to the members of the

27  Class predominate over any questions affecting only individual members, including legal and

28  factual issues relating to liability and damages;

1      f.      After determination of the predominant common issues identified above,

2  if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

3      g.      Plaintiff will fairly and adequately protect the interests of the Class in that

4  Plaintiff has no interests that are antagonistic to other members of the Class and has retained

5  counsel competent and experienced in the prosecution of class actions and antitrust litigation to

6  represent him and the Class;

7      h.      A class action is superior to other available methods for the fair and

8  efficient adjudication of this litigation since individual joinder of all damaged Class members is

9  impractical. The damages suffered by the individual Class members are relatively small, given

10  the expense and burden of individual prosecution of the claims asserted in this litigation. Thus,

11  absent the availability of class action procedures it would not be feasible for Class members to

12  redress the wrongs done to them. Even if the Class members could afford individual litigation,

13  the court system could not. Further, individual litigation presents the potential for inconsistent or

14  contradictory judgments and would greatly magnify the delay and expense to all parties and the

15  court system. Therefore, the class action device presents far fewer case management difficulties

16  and will provide the benefits of unitary adjudication, economy of scale and comprehensive

17  supervision in a single court; and

18      i.      Defendants and their co-conspirators have acted, and/or refused to act, on

19  grounds generally applicable to the Class, thereby making appropriate final injunctive relief with

20  respect to the Class as a whole.

21                          **BACKGROUND**

22  **The Jones Act**

23      25.     Because of its importance to international trade and national security and

24  defense, the ocean shipping industry has been protected by almost all countries including the

25  U.S. In the U.S., ocean shipping is governed by The Merchant Marine Act of 1920, commonly

26  known as the "Jones Act," 46 U.S.C. § 100 *et seq*.

27      26.     The Jones Act is a coastwide trade law which governs trade that includes the

28  transportation of merchandise between points in the United States and/or most of its island

**8**
**CLASS ACTION COMPLAINT**

1  territories and possessions, and associated commonwealths. *See,* 46 U.S.C. § 55101 (extending
2  Jones Act provisions).

3  27.  Under the Jones Act, any goods "transported by water, or by land and
4  water...between points in the United States...either directly or via a foreign port," are prohibited
5  from shipment unless the vessel transporting the goods "is wholly owned by citizens of the
6  United States for purposes of engaging in the coastwide trade" and has either been issued a
7  "certificate of documentation" or is exempt from documentation. 46 U.S.C. § 55102

8  28.  Thus, under the Jones Act, certain U.S.-owned vessels are granted the exclusive
9  privilege to engage in coasting trade concerning shipment of merchandise to or from the U.S.
10  territories, possessions or non-contiguous states.

11  29.  The Jones Act is designed to protect American shipping companies. These laws
12  are restrictive, prohibiting all other vessels, such as foreign-flagged, foreign built, foreign
13  crewed, or even foreign refurbished vessels, from engaging in this trade.

14  30.  The limitations imposed by the Jones Act, combined with the relatively small
15  size of the Jones Act trade routes, results in oligopolistic—or duopolistic in the case of non-
16  contiguous ocean shipping to Hawaii—markets where only a very small number of carriers
17  serve any route. Jones Act trade routes are subject to regulation concerning potential
18  excessiveness of rates.

19  31.  For shipment of merchandise from the West Coast of the United States to
20  Hawaii, for example, Matson and Horizon account for nearly 100 percent of non-contiguous
21  domestic ocean shipping to Hawaii—a duopoly.

22  32.  While Jones Act trade routes are subject to certain regulations, collusion, market
23  sharing, allocation of customers, restrictions on capacity, and other anticompetitive conduct
24  remains illegal under the Sherman Act, subject to certain exemptions not applicable here. *See,*
25  46 U.S.C. § 40307 (listing exemptions).

26  33.  In a statement to Grassroot Institute of Hawaii, Honolulu transportation expert
27  Cliff Slater said, "Were Hawaii to have an exemption to the Jones Act, freight costs would be
28

9
**CLASS ACTION COMPLAINT**

1  half of what they are today." *See,*

2  http://www.grassrootinstitute.org/GrassrootPerspective/MatsonHorizon043008.shtml

3  **Ocean Shipping of Merchandise Between The United States and Hawaii**

4      34.    Ocean shipping is an effective method of moving large quantities of raw

5  materials and nonperishable goods. Major commodities shipped through domestic ocean

6  shipping include crude petroleum, refined petroleum products, chemicals, manufactured goods,

7  farm products, food, and coal.

8      35.    The domestic ocean trade is comprise of three sectors: (1) noncontiguous trade

9  between the continental United States and Puerto Rico, Alaska, Hawaii, and other U.S. Pacific

10  Islands; (2) intercoastal trade between the Atlantic or Gulf and Pacific coasts by way of the

11  Panama canal; and (3) coastwise trade along the Atlantic, Gulf, and Pacific coasts, as well as

12  trade between coasts and the St. Lawrence Seaway.

13      36.    Hawaii, Guam, Alaska and Puerto Rico are the four main markets for

14  noncontiguous trade between the continental United States and its islands, territories and

15  possessions.

16      37.    Cargo for ocean carriage is charged by revenue tons (defined as the greater of the

17  cubic measure or weight of the shipment as packed for shipping), as well as other bill of lading

18  charges such as the receiving charges, bunker charges, currency factors, etc. Overall U.S.

19  domestic ocean trades amount to 196 million metric tons in 2002. As of December 2005,

20  revenue generated from ocean shipping in markets with carriers subject to the Jones Act was

21  approximately \$2.5 billion.

22      38.    Because of its location 2,500 miles off the West Coast, Hawaii is almost

23  exclusively dependent upon ocean shipping to import essential commodities such as food, fuel,

24  clothing, building materials, and automobiles. Local products—including pineapples, sugar,

25  molasses, and livestock—are equally as dependent on ocean shipping for export to the

26  continental United States, as well as for inter-island transport and foreign exportation.

27  Approximately 98.6 percent of Hawaii's imports are delivered via ocean shipping. Over 5

28

1  million metric tons of cargo was transported through noncontiguous domestic ocean shipping to
2  Hawaii in 2003 alone.

3  **Circumstantial Evidence of Anticompetitive Conduct**

4      39.    Several characteristics of the Hawaii Ocean Shipping industry facilitated
5  Defendants' conspiracy, including: market concentration, the fungible nature of the product,
6  significant barriers to entry, and ease of information sharing.

7      40.    Noncontiguous domestic ocean shipping between the United States and Hawaii is
8  a duopoly, which is conducive to collusion. Defendants Matson and Horizon control 100 percent
9  of the containerized portion of the market and 96 percent of the total market for noncontiguous
10 domestic ocean shipping to Hawaii. The remaining 4 percent of cargo is carried by small,
11 specialized barge and auto carrier lines.

12     41.    The high degree of concentration in the industry makes it easier for competitors
13 to engage in anticompetitive conduct because any given route is controlled by so few
14 companies. This is particularly true in the duopolistic conditions found in Hawaii noncontiguous
15 domestic ocean shipping.

16     42.    Hawaii Ocean Shipping services are highly fungible because almost all such
17 shipping is containerized and any container vessel can readily substitute for any other container
18 vessel. Thus, Defendants sell and Plaintiff (and Class members) purchases Hawaii Ocean
19 Shipping primarily on the basis of price.

20     43.    There are no substitutable services for Hawaii Ocean Shipping. Shipping heavy
21 goods via air freight is prohibitively expensive and there are no road or rail routes between
22 Hawaii and mainland United States.

23     44.    Price fixing and market allocation are particularly pernicious where, like here,
24 there is a highly concentrated, fungible market for which adequate substitutes do not exist.

25     45.    Defendants participate in trade association activities, which furthered the
26 conspiracy alleged herein. For example, Defendants are members of the Maritime Cabotage
27 Task Force ("MCTF"), a trade association founded on September 27, 1995 to protect the U.S.
28 maritime cabotage laws. Charles Raymond and Robert Zuckerman, both of Horizon, sit on the

1  MCTF's board of directors, and the organization's chairman is Phillip Grill, the executive
2  director of Matson.

3      46.     The MCTF lobbies the executive and legislative branches of the federal
4  government to promote the ocean shipping industry and to protect the interests of its members in
5  maritime laws such as the Jones Act.

6      47.     Defendants Horizon and Matson also belong to the Transportation Institute.
7  Founded in 1967, the Transportation Institute is dedicated to maintaining strong maritime
8  capability as a means of protecting the United States economy, including through support for
9  Jones Act activities. Charles Raymond of Horizon serves on the Institute's board of directors.

10     48.     The Defendants have ready access to industry data which facilitates their
11 effectuation and monitoring of the conspiracy. For example, the Port Import Export Reporting
12 Service ("PIERS") collects and distributes data for the maritime industry, including container
13 size and quantity, cargo quantity and unit of measure, cargo weight and volume. The distribution
14 of this type of information within the industry has allowed defendants to police their conspiracy.

15     49.     In addition to the restrictions the Jones Act imposes on any company trying to
16 enter the domestic ocean carriage industry, there are substantial additional barriers to entry,
17 including: (1) entrenched market positions by the incumbent shipping companies; (2) the high
18 costs associated with ocean transport vessels and building an infrastructure for those vessels; (3)
19 the need to develop a customer base; and (4) constraints on port space in Hawaii. These barriers
20 facilitate the conspiracy alleged herein because they insulate existing shipping companies from
21 new competition and perpetuate the high market concentration.

22     50.     In its 2007 Form 10-K, defendant Horizon explained:

23          Given the number of existing Jones Act qualified vessels, the high capital
            investment and long delivery lead times associated with building a new
24          containership in the U.S., the substantial investment required in
            infrastructure and the need to develop a broad base of customer
25          relationships, the markets in which we operate [including noncontiguous
            domestic ocean shipping to Hawaii] have been less vulnerable to over
26          capacity and volatility than international shipping markets.

27 //

28

**12**
**CLASS ACTION COMPLAINT**

1

## DEFENDANTS' ANTITRUST VIOLATIONS

2      51.     Defendants have engaged in a contract, combination, trust or conspiracy, the

3   effect of which was to raise the prices for Hawaii Ocean Shipping services to artificially inflated

4   levels. Two key features of this conspiracy were lockstep increases in fuel surcharges and

5   capacity sharing.

6      52.     During the Class Period, Matson and Horizon instituted parallel, identical and

7   nearly simultaneous increases of fuel surcharges on over 20 occasions. In each case, Matson

8   publicly announced the surcharge increase and Horizon followed suit within days.

9      53.     Both Defendants first instituted fuel surcharges in 1999, with a surcharge of

10  1.75% of revenue. Since then, Defendants have increased their fuel surcharges in lockstep:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Effective Date | Matson Fuel Surcharge (%) | Horizon Fuel Surcharge (%) |
|---|---|---|
| October 1999 | 1.75 | 1.75 |
| February 2000 | 2.25 | 2.25 |
| April 2000 | 3.25 | 3.25 |
| October 2000 | 4.25 | 4.25 |
| November 2001 | 3.25 | 3.25 |
| May 2002 | 4.75 | 4.75 |
| October 2002 | 6.0 | 6.0 |
| March 2003 | 7.5 | 7.5 |
| May 2003 | 8.0 | 8.0 |
| June 2004 | 8.8 | 8.8 |
| October 2004 | 9.2 | 9.2 |
| April 2005 | 10.5 | 10.5 |
| July 2005 | 11.5 | 11.5 |
| October 2005 | 13.0 | 13.0 |
| January 2006 | 15.0 | 15.0 |
| April 2006 | 18.5 | 18.5 |
| June 2006 | 21.25 | 21.25 |
| October 2006 | 19.75 | 19.75 |
| November 2006 | 18.75 | 18.75 |
| January 2007 | 17.5 | 17.5 |
| March 2007 | 19.5 | 19.5 |
| May 2007 | 22.5 | 22.5 |
| August 2007 | 24.0 | 24.0 |
| December 2007 | 29.0 | 29.0 |
| February 2008 | 31.5 | 31.5 |
| April 2008 | 33.75 | 33.75 |

| July 2008 | | 38.25 | 38.25 |

54.    While Defendants publicly claimed the fuel surcharges were based on external factors, an examination of the charges and the external environment indicates that this is merely a pretext for their collusion:

a.    Fuel surcharges are allegedly determined based on fuel costs as a percentage of revenue. However, Defendants Matson and Horizon have very different costs and revenue. Different ships with different fuel efficiencies, on different routes, the use of hedging, and individual fuel conservation efforts, all make it impossible that Defendants had identical fuel expenses.

b.    Defendants' fuel surcharge increases far exceed increases in U.S. crude oil prices. In fact, a number of Defendants' increases actually followed decreases in U.S. crude oil prices.

c.    Defendants' ships operate on either diesel fuel (newer ships) or Residual Fuel Oil (RFO) (older ships). Defendants' fuel surcharge increases exceeded the actual prices of either type of fuel. While the price of diesel fuel and RFO increased approximately 650% and 450% respectively from late 1999 to the present, the Defendants' fuel surcharges increased approximately 3800% over the same period.

d.    In a competitive market, when one competitor increases their fuel surcharge to a rate that exceeded actual costs, the other competitor would not increase their surcharge too, but rather, would attempt to capture the less fuel efficient carrier's market share. Instead, Matson and Horizon choose not to compete on price. A plausible explanation for this behavior is that Defendants are conspiring.

55.    The 8 year pattern of lockstep fuel surcharges was broken for the first time immediately after the Department of Justice announced its investigation into the domestic ocean shipping industry (discussed further *infra*). On May 9, 2008, Horizon announced that it would raise its fuel surcharge from 33.75% to 35.35% effective June 8, 2008. On May 19, 2008, Matson announced it would maintain its fuel surcharge at the existing rate of 33.75%. Two days

**14**
**CLASS ACTION COMPLAINT**

1  later, Horizon announced it would not implement the previously announced increase and would
2  instead keep the fuel surcharge at the existing rate.

3      56.    However, Defendants reverted to their usual pattern of lockstep increases shortly
4  thereafter. On June 13, 2008, Matson announced that it would increase its fuel surcharge 4.5%
5  from 33.75% to 38.25% effective July 13. One week later, Horizon announced that it would
6  match Matson's increase, increasing its fuel surcharge from 33.75% to 38.25% effective July 14,
7  2008.

8      57.    The second key feature of Defendants' conspiracy is agreeing to share capacity
9  on their ships. By sharing capacity, this duopoly has essentially created a monopoly.
10  Defendants' capacity sharing agreement allows Defendants to ship their cargo on the other's
11  ships at highly preferential rates. This allows Defendants to avoid adding additional ships to
12  their routes while at the same time giving them more capacity and more frequent service at less
13  cost.

14      58.    Defendants' capacity sharing is widely known and publicly advertised. For
15  example, Horizon's website advertises Matson's sailings on Matson's ships, such as the RJ
16  Feiffer, as Horizon's "MXW Service."

17      59.    An example of Defendants' capacity sharing agreements and their effects
18  occurred in or around 2000 when Matson was running a seven-vessel fleet that included a bi-
19  weekly service to Los Angeles. To obtain a competitive advantage, Horizon offered a vessel for
20  service on the opposite week of Matson's sailings. Matson responded by adding another ship to
21  the route in order to offer weekly service. This competition significantly reduced the amount of
22  cargo on Horizon's ship, leading to under-utilization and therefore higher expenses. Further,
23  Horizon did not have another ship available to provide competitive weekly service. Instead of
24  continuing to compete, Horizon negotiated a highly attractive rate with Matson for their weekly
25  freight and then removed a ship from its route, thereby reducing capacity and costs, and
26  increasing profits.

27      60.    During the Class Period, Plaintiff and the class members purchased Hawaii
28  Ocean Shipping services from the Defendants.

1    61.    Plaintiff and the class member paid more for Hawaii Ocean Shipping services
2    than they would have paid had Defendants not colluded to fix the prices for Hawaii Ocean
3    Shipping services at supracompetitive levels.

4    62.    As a direct and proximate result of Defendants' conspiracy, Plaintiff and the class
5    members have been injured and financially damaged in their respective businesses and property
6    in presently undetermined amounts.

7                    **DEPARTMENT OF JUSTICE INVESTIGATION**

8    63.    On April 17, 2008, it was disclosed that the Department of Justice's Antitrust
9    Division ("DOJ") was investigating possible anti-competitive practices in the domestic ocean
10   shipping industry.

11   64.    That same day, federal agents raided defendant Horizon's corporate headquarters
12   in Charlotte, North Carolina, as well as its Puerto Rico office. Horizon stated that the agents
13   were armed with search warrant and a grand jury subpoena. Following the raid, Horizon began a
14   company review of issues raised by the DOJ probe and place six employees on administrative
15   leave. At least three of these six employees have subsequently resigned.

16   65.    According to Alexander & Baldwin's 10Q filed on May 2, 2008, "On April 21,
17   2008, Matson was served with a grand jury subpoena from the U.S. District Court for the
18   Middle District of Florida for documents relating to water carriage in connection with the
19   Department of Justice's investigation into the pricing practices of carriers operating in the
20   domestic trades. Matson understands that while the investigation is currently focused on the
21   Puerto Rico trade, it also includes pricing practices in connection with all domestic trades,
22   including the Alaska, Hawaii and Guam trades. Matson does not operate vessels in the Puerto
23   Rico and Alaska trades. It does operate vessels in the Hawaii and Guam trades. Matson will
24   cooperate fully with the Department of Justice.

25   66.    To obtain search warrants like the ones executed on these Defendants, the DOJ
26   had to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of
27   statements in furtherance of the unlawful restraint of trade.

28   //

                                    **16**
                            **CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VIOLATIONS ALLEGED

### (Violation of Section 1 of the Sherman Act)

67.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

68.    Beginning at a time unknown to Plaintiff, but from at least October 1, 1999, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain and/or stabilize the price of Hawaii Ocean Shipping services paid by Plaintiff and the other Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

69.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants did those things that they combined and conspired to do, including, but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

      a.    Participated in meetings, phone conferences and other communications to exchange information used by Defendants to formulate and implement the Hawaii Ocean Shipping price and fuel surcharge increases;

      b.    Agreed to the prices and fuel surcharges that would be charged for Hawaii Ocean Shipping services;

      c.    Issued price announcements, fuel surcharge increases, and price quotations in accordance with the agreements reached; and

      d.    Engaged in meetings, conversations and communications for the purposed of monitoring and adhering to the agreed-upon prices.

70.    The combination and conspiracy alleged herein has had the following effects, among others:

      a.    Price competition in Hawaii Ocean Shipping services has been restrained, suppressed and/or eliminated;

**17**
**CLASS ACTION COMPLAINT**

1

        b.     Prices and specifically fuel surcharges assessed by Defendants for Hawaii

2

               Ocean Shipping services have been fixed, raised, maintained and

3

               stabilized at artificially high, non-competitive levels; and

4

        c.     Those who purchased Hawaii Ocean Shipping services from Defendants

5

               have been deprived the benefits of free and open competition.

6

    71.     During the Class Period, Plaintiff and members of the Class purchased Hawaii

7

Ocean Shipping services from Defendants.

8

    72.     As a direct and proximate result of Defendants' illegal contract, combination and

9

conspiracy, Plaintiff has been injured and will continue to be injured in his business and property

10

by paying more for Hawaii Ocean Shipping services provided by Defendants than he would

11

have paid in the absence of the combination and conspiracy.

12

    73.     Plaintiff and the members of the Class request three times their actual damages

13

that resulted from Defendants' illegal conspiracy to fix the prices for Hawaii Ocean Shipping

14

services. The total amount of damages is presently undetermined.

15

    74.     Plaintiff and the Class are entitled to an injunction against Defendants, preventing

16

and restraining the violations alleged herein.

17

**FRAUDULENT CONCEALMENT**

18

    75.     Throughout the relevant period, Defendants affirmatively and fraudulently

19

concealed their unlawful conduct against Plaintiff and the Class.

20

    76.     Plaintiff and the members of the Class did not discover, and could not have

21

discovered through the exercise of reasonable diligence, that Defendants were violating the

22

antitrust laws as alleged herein until April 17, 2008, when it was disclosed that the DOJ is

23

investigating possible anti-competitive practices in the domestic ocean shipping industry, and

24

that both Matson and Horizon had been served with grand jury subpoenas.

25

    77.     Plaintiff and the members of the Class could not have discovered the violations

26

earlier than that time because Defendants conducted their conspiracy in secret, concealed the

27

nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their

28

activities through various other means and methods designed to avoid detection. The conspiracy

1   was by its nature self-concealing. In addition, during the Class Period, Defendants falsely

2   attributed price increases to the rising cost of fuel.

3       78.     Plaintiff had no reason to disbelieve these statements which on their face

4   appeared to be reasonable explanations for the increasing prices for Hawaii Ocean Shipping

5   services. Furthermore, most of the explanations provided by Defendants involved non-public

6   and/or proprietary information completely in the Defendants' control such that Plaintiff and

7   members of the Class could not verify their accuracy. Defendants' purported reasons for the

8   price increases of Hawaii Ocean Shipping services were materially false and misleading and

9   were made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

10  In truth, at all relevant times, the prices of Hawaii Ocean Shipping services were artificially

11  inflated and maintained as a direct result of the Defendants' anti-competitive scheme, the

12  operation of which was a substantial (but undisclosed) factor in the pricing of Hawaii Ocean

13  Shipping services during the Class Period.

14      79.     As a result of Defendants' fraudulent concealment of the conspiracy, Plaintiff and

15  the Class assert the tolling of any applicable statute of limitations affecting the rights of action of

16  Plaintiff and the members of the Class.

17                              **PRAYER FOR RELIEF**

18      WHEREFORE, Plaintiff prays as follows:

19      A.      That the Court determine that this action may be maintained as a class action

20  under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

21      B.      That the Court adjudge and decree that the unlawful conduct, contract,

22  combination and conspiracy alleged herein constitutes a *per se* unreasonable restraint of trade in

23  violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

24      C.      That judgment be entered against Defendants and in favor of Plaintiff and the

25  Class he represents for treble damages as allowed by the Sherman Act, as determined to have

26  been sustained by them, together with costs of suit, including reasonable attorneys' fees;

27      D.      That Defendants, their co-conspirators, successors, transferees, assigns, parents,

28  subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all

1 | other persons acting or claiming to act on behalf of Defendants, or in concert with them, be

2 | permanently enjoined and restrained from, in any manner, directly or indirectly, continuing,

3 | maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of

4 | action, or adopting or following any practice, plan, program or design having a similar purpose

5 | or effect in restraining competition;

6 |      E.     That the Court award Plaintiff and the Class he represents attorneys' fees and

7 | costs, and pre-judgment and post-judgment interest as permitted by law; and

8 |      F.     That the Court award Plaintiff and the Class he represents such other and further

9 | relief as may be necessary and appropriate.

10 | **JURY DEMAND**

11 |      Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

12 |

13 | Dated: August 13, 2008        By:     Mario N. Alioto

14 |                 Mario N. Alioto (56433)

                Lauren C. Russell (241151)

15 |                 TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP

                2280 Union Street

16 |                 San Francisco, CA  94123

                Telephone: (415) 563-7200

17 |                 Facsimile: (415) 346-0679

18 |                 malioto@tatp.com ; laurenrussell@tatp.com

19 |                 Joseph M. Patane (72202)

                LAW OFFICES OF JOSEPH M. PATANE

20 |                 2280 Union Street

                San Francisco, CA 94123

21 |                 Telephone: (415) 563-7200

                Facsimile: (415) 346-0679

22 |                 E-mail: jpatane@tatp.com

23 |

24 |                 **Attorneys for Plaintiff Brian Foster**

                **And All Others Similarly Situated**

25 |

26 |

27 |

28 |